IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|                                                      |   |                          |
|------------------------------------------------------|---|--------------------------|
|                                                      | : | **Civil No. 1:18-cv-0897** |
| **BRENDAN RODEN-REYNOLDS**                           | : |                          |
|                                                      | : |                          |
|                                                      | : |                          |
| **Plaintiff,**                                       | : |                          |
|                                                      | : |                          |
| **v.**                                               | : |                          |
|                                                      | : |                          |
| **METROPOLITAN LIFE**                                | : |                          |
| **INSURANCE COMPANY; TYCO**                          | : |                          |
| **ELECTRONICS CORPORATION;**                         | : |                          |
| **AND TYCO ELECTRONICS LONG**                        | : |                          |
| **TERM DISABILITY PLAN**                             | : |                          |
|                                                      | : |                          |
| **Defendant.**                                       | : | **Judge Sylvia H. Rambo** |

# M E M O R A N D U M

In this action arising under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 ("ERISA"), Defendants Metropolitan Life Insurance Company ("MetLife"), Tyco Electronics Corporation ("TE") and Tyco Electronics' Long Term Disability Plan ("the Plan") (collectively, "Defendants") have moved for summary judgment relating to MetLife's denial of Plaintiff Brendan Roden-Reynolds's ("Plaintiff") claim for long-term disability benefits. The primary issue before the court is whether the plan administrator abused its discretion in denying Plaintiff's claim. For the reasons discussed below, the court will grant Defendants' motion for summary judgment.

## I. Background

The Plan is an employee welfare benefit plan as defined by ERISA. MetLife is the administrator of the Plan and has discretionary authority, granted by The Plan, to interpret its terms and determine whether a covered individual is entitled to receive benefits. Plaintiff was previously employed as a software developer for TE and was a member of the plan.

In pertinent part, the language of the Plan defines "Disabled or Disability" as follows:

> **Disabled or Disability** means that, due to Sickness or as the direct result of accidental injury:
>
> You are receiving Appropriate Care and Treatment and complying with the requirements of such treatment; and
>
> You are unable to earn:
>
> 1. during the Elimination Period and the next 24 months of Sickness or accidental injury, more than 80% of Your Predisability Earnings at Your Own Occupation from any employer in Your Local Economy; and
>
> 2. after such period, more than 60% of your Predisability Earnings from any employer in Your Local Economy at any gainful occupation for which You are reasonably qualified taking into account your training, education and experience.

(Doc. 18-1, ¶ 3.) Specifically related to Plaintiff's disability, the benefits plan provides as follows:

> **For Disabilities Due to . . . Neuromuscular, Musculoskeletal or Soft Tissue Disorder . . .**

Neuromuscular, musculoskeletal, or soft tissue disorder including, but not limited to, any disease or disorder of the spine or extremities and their surrounding soft tissue; including sprains and strains of joints and adjacent muscles, unless the Disability has objective evidence of:

- Seropositive Arthritis;
- Spinal Tumors, malignancy, or Vascular Malformations;
- Radiculopathies;
- Myelopathies;
- Traumatic Spinal Cord Necrosis; or
- Myopathies . . .

We will limit Your Disability benefits to a combined lifetime maximum for any and all of the above equal to the lesser of:

- 24 months; or
- the Maximum Benefit Period.

(*Id.* at ¶ 4.)  Lastly, the plan defines "Radiculopathies" as "disease of the peripheral nerve roots supported by objective clinical findings of nerve pathology."  (*Id.*)

On April 9, 2014, Plaintiff applied for short term disability benefits ("STD"),[1] which he received until approximately October 13, 2014, at which point he applied for long term disability ("LTD") benefits due to degenerative disc disease, cervical and lumbar, with a history of lumbar laminectomy and fusion.  (Doc. 23, ¶ 2.) MetLife initially denied the LTD request, concluding that Plaintiff was able to return

---

[1] In support of his claim for STD benefits, Plaintiff provided MetLife with an office note of Curtis A. Goltz, D.O. ("Dr. Goltz") dated April 16, 2014, which stated diagnoses of:

1.  History of lumbar laminectomy and fusion, lumbar spine.

2.  History of anterior cervical discectomy and fusion, cervical spine, with radicular symptoms bilateral lower extremities.

3.  Questionable carpal tunnel syndrome, bilateral upper extremities.

(Doc. 18-1, ¶ 6.)

to work with certain limitations.  In arriving at this conclusion, MetLife requested and received a Medical Director review from Joseph Monkofsky, Jr., M.D., MPH, FACOEM ("Dr. Monkofsky"), who opined that Plaintiff could return to work full time with limitations on amounts to be lifted, bending, twisting, stooping, and standing upright.  (Doc. 18-1, ¶ 14.)  Dr. Goltz reviewed Dr. Monkofsky's report and issued an office note stating that Plaintiff was unable to stand or sit for long enough periods of time to perform his work duties.  (*Id.* at 15.)  Upon review of Dr. Goltz's note, Dr. Monkofsky revised his assessment, concluding that Plaintiff could return to work full time, with the previously noted limitations as well as a standing desk and the ability to change positions as necessary.  (*Id.* at 16.)  This determination was supported by a December 2, 2014 Clinical Assessment.  (*Id.* at 18.)  By correspondence dated December 5, 2014, Plaintiff was told that his claim was denied effective October 13, 2014, based upon the Clinical Assessment and Dr. Monkofsky's review.  (*Id.* at 19.)  Plaintiff subsequently retained counsel, who by letter dated May 29, 2015, appealed the claim determination, submitting a list of Plaintiff's medications, literature describing possible side effects, medical records from Dr. Goltz and Thomas Skeehan, M.D. ("Dr. Skeehan"), and online job descriptions for computer programmers and software developers.  (*Id.* at 20.)  After review of those materials, MetLife requested an Independent Physician Consultant

review, which was performed by Lucia McPhee, M.D. ("Dr. McPhee"). Dr. McPhee

issued a report on June 25, 2015. (*Id.* at 24.) Pertinently, Dr. McPhee opined that:

> As of 4/16/14 it was reasonable to limit sitting to an occasional basis, and walking/standing combined to an occasional basis due to his low back condition with symptoms into the lower extremities and prior fusion and degeneration with some stenosis as noted on imaging studies reviewed above. From the physical perspective, as of 10/29/14 he should have been able to stand and/or sit (such as with a sit/stand work station) for 45 minutes to 1 hour at a time followed by a 10-15 minute break during which time he could lay down, as was mentioned in the note of Dr. Goltz dated 11/20/14. This could be limited to a part time basis of 4 hours of work per day due to his overall pain complaints associated with sitting, standing and walking with underlying lumbar degeneration and stenosis. Walking could be on an occasional basis, standing could be on an occasional basis and sitting could be on a frequent basis . . . although his condition is chronic, he may have been able to increase to a full time basis as of 11/29/14 with the same limitations suggesting about a 10 to 15 minute break during which time he could lay down if needed after every 45 minute to 1 hour of sitting and/or standing.
>
> . . .
>
> I am unable to state if claimant's memory or other cognitive functions were affected to a significant degree that would preclude him from effectively performing his usual work tasks.

(*Id.* at 24-25.) MetLife additionally requested a vocational review that concluded,

in pertinent part:

> [Plaintiff is not] able to earn commensurate wage, [because of his] need to lie down for 10-15 minutes after 45 minutes of work. From 11/29/14 forward [Plaintiff] could work full time but would not be competitively employable because he would require a 10-15 minute break after 45 minutes of work and this would be beyond what is considered a reasonable accommodation as we would need to be on break for approximately 2 hours per day.

(*Id.* at 27.)  Based, in part, on Dr. McPhee's assessment, the vocational review, and review of treating provider's notes, MetLife reversed its determination and granted Plaintiff's request for LTD benefits.  (*Id.* at 28; Doc. 23, ¶ 28.)

By letter dated July 14, 2015, Plaintiff was notified that because his disability was due to "disc degeneration, cervical degeneration, lower back pain and lumbar post laminectomy syndrome," his LTD benefits were subject to a 24 month maximum benefit period ("MBP") which would end on October 7, 2016, and that he would be required to "continue to satisfy the definition of Disability solely due to other non-limited medical condition(s) and other plan requirements" in order to receive additional benefits.  (Doc. 18-1, ¶ 29.)  Over the course of the next year, Plaintiff and Dr. Goltz continued to provide updated medical records to MetLife. On September 28, 2015, a MetLife Nurse Consultant and Unit Leader reviewed Plaintiff's file and determined that MetLife should consider "whether he could work in a sedentary capacity if he has the ability to change positions, and if so, a labor market study should be performed to determine whether there were any employers in his area who could accommodate this restriction." (*Id.* at 32.)  When Dr. Goltz was asked whether such a work environment was feasible given Plaintiff's condition, he responded "no" and that Plaintiff needed to lay down to relieve the pain caused by his disability.  (*Id.* at 33.)  A labor market study performed at MetLife's request determined that, although many area employers could accommodate a sit/stand work

environment, none could accommodate Plaintiff's need to lay down approximately every hour. (*Id.* at 34.) Based on this study, MetLife concluded that Plaintiff's LTD benefits would expire on October 7, 2016, unless he could show disability due to a non-limited medical condition. (*Id.*) On August 17, 2016, a MetLife Nurse Consultant reviewed the medical records and concluded that they did not support a finding that Plaintiff had a medical condition that was not subject to the limited duration benefit period that would prevent him from returning to work. (*Id.* at 37.) On or around October 5, 2016, Plaintiff sent a letter that provided additional medical records in an effort to demonstrate that he qualified for additional benefits beyond the MBP. Around the same time, but prior to receipt of Plaintiff's letter, MetLife notified Plaintiff via letter that his plan benefits were paid in full. (*Id.* at 38-39.) MetLife notified Plaintiff that it would seek an independent medical review, which was performed by Dennis S. Gordan, M.D. ("Dr. Gordan"). Dr. Gordan concluded, relevantly, that:

> there is no evidence of a seropositive arthritis or any of the other diagnoses, except for the possibility of radiculopathy and myelopathy. Myelopathy is mentioned in only one note, and is essentially impossible, because that note mentions a lumbar myelopathy, and the spinal cord terminated above the level of any lumbar pathology. Radiculopathy is mentioned several times, but was not found on electrodiagnostic testing, although it does receive partial support in the physical examination findings of decreased sensation in the L5 and S1 dermatomes and leg weakness, although the later appears to be generalized leg weakness, and thus not root specific. The evidence for radiculopathy is, thus, not conclusive, but Dr. Goltz' staff has said that

the claimant would be seen again and additional records covering that visit could be requested. These could alter this opinion.

(*Id.* at 42.)  Dr. Gordan's conclusion was sent to Plaintiff's treating physicians for review and comment.  Dr. Goltz commented that:

I continue to be [Plaintiff's] treating physician, and believe to a reasonable degree of medical certainty that [Plaintiff] has chronic cervical, thoracic and lumbar radiculitis precluding his ability to work regularly.

. . . .

In answering the question as what objective evidence specifically I relied upon in finding that [Plaintiff] suffered from radiculopathies, it had to do with the MRI, both reports and images regarding both his neck and lower back surgery, the additional subsequent neurological reports, specifically X-rays of further degenerative changes and a matching physical exam.

(*Id.* at 45.)  Dr. Goltz moreover confirmed that Plaintiff did not suffer from any myopathies.  (*Id.*)  After review of Dr. Goltz's note, Dr. Gordan issued a reply:

[Dr. Goltz's] own statement is that the claimant had been followed for over 7 years "for continued chronic cervical, thoracic and lumbar radiculopathies," but on 11/16/16, the claimant was diagnosed as having a "history of chronic radiculitis."  [Dr. Goltz] went on to use radiculitis and radiculopathy in a seemingly interchangeable fashion, but these terms are generally considered different, with radiculitis taken as a radicular type of pain from nerve root irritation without actual nerve root impairment. Further, chronic radiculopathy may mean residual symptoms after nerve root compression is relieved by surgery, continued signs after such surgery, or findings on electrodiagnostic testing suggestive of prior active radiculopathy without current active membrane instability. It is thus often difficult to tell what examiners mean and what the actual clinical situation is. The absence of atrophy noted on 7/28/16, suggests that, even if pain inhibited the claimant's efforts on strength testing, the claimant is usually active and thus maintaining muscle activity and mass. I did not hold electrodiagnostic

testing out as an indispensable tool for diagnosing radiculopathy, but it is a test which, had the results had the appropriate abnormalities, would have added weight to the diagnosis. That would have been very helpful, given the several axial degenerative changes on imaging and the several possible explanations for weakness and sensory change. Also, I had no information regarding the claimant's findings prior to and soon after his surgery. Had any of those examinations revealed no findings of radiculopathy, or a remission of radiculopathic findings after surgery, later findings suggestive of or consistent with radiculopathy would have suggested that current findings were not merely residuals. A positive Spurling sign, which Dr. Goltz states is a "test to confirm continuing radicular symptoms," is actually a provocative maneuver that can cause root impingement pain, even when such does not exist without the provocation. As I noted, physical exam evidence of specific nerve root impairment has not been conclusive, and Dr. Goltz own 11/20/14 note said that the claimant's axial pain, not radiculopathic pain, was "textbook ... given his radiographic findings." It seems that currently [Plaintiff] has adjacent level disease, which could cause his pain, and that pain could inhibit his effort on strength testing, causing apparent weakness.

(*Id.* at 46.) A nurse consultant reviewing Plaintiff's appeal noted that while electrodiagnostic tests did not confirm a radiculopathy, "[r]adiculopathy is based on a condition of radiographic, physical and other testing including EMG/NCS testing." (Doc. 23, ¶ 46.) By letter dated January 13, 2017, MetLife upheld the denial of Plaintiff's requested additional LTD benefits, primarily on the grounds that Plaintiff failed to provide "objective evidence" of his continuing disability. (Doc. 18-1, ¶ 2; 47.)

## II.    Legal Standard

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A factual dispute is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party. *Id.*

The party seeking summary judgment has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 145-46 (3d Cir. 2004). It is not the court's role to weigh the disputed evidence or to make credibility determinations. *Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc.*, 998 F.2d 1224, 1230 (3d Cir. 1993)). Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out...that there is an absence of evidence to support the nonmoving party's claims." *Id.* at 325. If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. *Id.* at 322. Moreover, the mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue. *Anderson*, 477 U.S. at 249-50.

## III. Discussion

When evaluating challenges to denials of benefits under ERISA, district courts must review the plan administrator's decision under a *de novo* standard of review, unless the plan grants discretionary authority to the administrator or fiduciary to determine eligibility for benefits or interpret the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). When discretionary authority is given to an administrator of a plan, a deferential standard of arbitrary and capricious is applied. *Id.* at 111; *Estate of Schwing v. The Lilly Health Plan*, 562 F.3d 522, 525 (3d Cir. 2009), *abrogated on other grounds*, *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008). Where there is a valid reservation of discretionary authority, "a District Court may overturn an administrator's decision only if it is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Clauss v. Plan*, 196 F. Supp. 3d 463, 469 (M.D. Pa. 2016) (quoting *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 845 (3d Cir. 2011)). A decision regarding eligibility for benefits is not arbitrary and capricious if the decision "is the

result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Id.* (quoting *Balmert v. Reliance Standard Life Ins. Co.*, 601 F.3d 497, 501 (6th Cir. 2010)).

Substantial evidence exists "if there is sufficient evidence for a reasonable person to agree with the decision." *Courson v. Bert Bell NFL Player Ret. Plan*, 214 F.3d 136, 142 (3d Cir. 2000) (internal citation and quotation marks omitted). Under the arbitrary and capricious standard "the court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits." *Abnathya v. Hoffman–La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993). When a court, however, "exercise[s] *de novo* review, the role of the court is to determine whether the administrator . . . made a correct decision" and the "administrator's decision is accorded no deference or presumption of correctness." *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413-14 (3d Cir. 2011) (citations and quotations omitted).

The parties do not contest that the Plan vests discretionary authority to MetLife (Doc. 18-1, ¶ 5), and Defendants move for summary judgment arguing that the denial of benefits was a valid exercise of that discretion and that the decision was based upon substantial evidence. Plaintiff primarily argues that summary judgment is improper because five "issues of material fact" exist as to whether Plaintiff was

entitled to benefits under the plan.[2]  The first issue of fact appears to be that structural conflicts of interest weigh in favor of a conclusion that the discretionary decision exercised by MetLife was arbitrary and capricious.  The remaining issues are construed by Plaintiff as procedural conflicts: (1) whether MRIs, reports of back surgery, radiologic reports, and physical examinations constitute objective clinical findings; (2) whether radiculitis and radiculopathy are interchangeable terms; (3) whether a positive Spurling constitutes objective evidence of a radiculopathy; and (4) whether MetLife's failure to order an Independent Medical Exam  ("IME") and requirement that Plaintiff apply for social security disability benefits were arbitrary and capricious.  The court will first address the conflicts alleged by Plaintiff.

An arbitrary and capricious standard should be utilized even when a conflict of interest exists.  *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 110 (2008). The Supreme Court has held that a conflict of interest exists for ERISA purposes where the plan administrator evaluates and pays benefit claims, even where the

---

[2] Other courts have observed the "obvious discongruence" between the summary judgment standard and the discretionary standard of review for plan determinations. *Robinson v. Liberty Life Assur. Co. of Bos.*, 25 F. Supp. 3d 541, 551 n.7 (M.D. Pa. 2014).  "On the one hand, the arbitrary and capricious standard requires only that an administrative decision be supported by substantial evidence, while, on the other hand, the summary judgment standard inquires whether the entry of judgment is inevitable, even indulging all reasonable inferences in the nonmovant's favor." *Id.* (citing *Leahy v. Raytheon Co.*, 315 F.3d 11, 17 (1st Cir. 2002)).  "[T]he degree of deference due to a plan administrator is an underlying legal matter, and, by contrast, summary judgment provides a procedural mechanism designed to dispose of cases with no triable issues." *Id.* (citing *Leahy* at 17-18.)  Thus, "the district court must ask whether the aggregate evidence, viewed in the light most favorable to the non-moving party, could support a rational determination that the plan administrator acted arbitrarily in denying the claim for benefits." *Leahy*, 315 F.3d at 18.

administrator is an insurance company and not the beneficiary's employer. *Id.* at 111. In determining whether the decision to deny benefits was arbitrary and capricious, courts will weigh, as a factor, a potential conflict of interest. *Id.* at 117; *Firestone*, 489 U.S. at 115.

## A. Structural Conflicts of Interest

Plaintiff first argues that a structural conflict exists because MetLife makes the determination whether to pay benefits and then pays those benefits out of its own finances, and Defendant does not dispute that this is a structural conflict. *See Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008). Defendant, however, argues that it took steps to mitigate this conflict and the conflict has no bearing on Plaintiff's claim determination. "The Supreme Court has recognized . . . that a structural conflict 'should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.'" *Berkoben v. Aetna Life Ins. Co.*, 8 F. Supp. 3d 689, 706 (W.D. Pa. 2014) (quoting *Glenn,* 554 U.S. at 117.) Plaintiff also argues that a different type of structural conflict exists, specifically that "Claims Specialist Fuchs" reviewed Plaintiff's claim and eventually determined that he was not entitled to benefits beyond the 24-month MBP and that

Claims Specialist Fuchs subsequently reviewed his appeal and reaffirmed his denial. Plaintiff, however, points to no case law that suggests that this type of alleged conflict is a true structural conflict that would weigh in favor of this court finding that MetLife's decision was arbitrary and capricious.

Defendant submitted a declaration of Pamela Halligan, Vice President of MetLife, which stated that the financial department has no interaction with the claims processing department and that claims processing employees receive no recognition or compensation based on the number of claims that they approve or deny or the value of claims that they approve or deny. (Doc. 18-34.) As Plaintiff notes, the declaration does not discuss in depth the corporate structure of MetLife; however, Plaintiff points to no additional information that should have been included in the definition or that would have altered the court's analysis. Similarly, Plaintiff's contention that the declaration attests only to current practices rather than those at the time of Plaintiff's claim determination is a semantic distinction in the absence of any indication that the claims processing structure changed in the interim. The declaration satisfies the Third Circuit's admonition that structural conflicts must be addressed by separating claims processing and financial departments, and the Third Circuit has not imposed a minimum quantum of detail that must be included in a description of a plan administrator's conflicts mitigation process. *See Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 845 (3d Cir. 2011). The declaration does, however,

specify that claims processing specialists receive no remuneration for the number or value of claims that they grant or deny. Thus, the only conflict appears to be that of human nature: one rarely rejoices in admitting that one had erred. Accordingly, the court finds that MetLife has largely mitigated any inherent structural conflict, consistent with *Glenn* and *Miller*.

## B. Procedural Conflicts of Interest

### i.  *Objective evidence of radiculopathy*

Plaintiff next argues that a procedural conflict exists because the Plan inserted an additional criterion that was not in the Plan documents. Specifically, Plaintiff argues the Plan requires "objective criteria" of radiculopathy while MetLife required electrodiagnostic evidence of radiculopathy beyond what should be considered "objective criteria." Furthermore, Plaintiff argues that there is an unresolved issue of material fact as to whether Plaintiff supplied the required "objective criteria." Initially, the court notes that there is no definition as to what objective criteria means within the context of the Plan documents. If a term within the plan itself is ambiguous, then the plan administrator is entitled to deference in interpreting that term. *Lasser v. Reliance Standard Life Ins. Co.*, 344 F.3d 381, 385 (3d Cir. 2003) (citing *Skretvedt v. E.I. DuPont de Nemours & Co.*, 268 F.3d 167, 177 (3d Cir. 2001)).

The Third Circuit has previously addressed the scenario where a plan requires "objective evidence" of certain conditions before granting benefits. *Steele v. Boeing Co.*, 225 F. App'x 71, 74 (3d Cir. 2007) ("[T]he District Court properly observed that [the administrator']s requiring of 'exam/test findings that indicate severe degenerative changes or cord compression requiring surgical intervention' was an 'inappropriate reason' for denying [] benefits because 'fibromyalgia is a condition that cannot be proved objectively.' By asking for objective evidence for a condition that cannot be proved objectively, [administrator] was demanding what cannot exist."). In contrast, a diagnosis of radiculopathy, unlike fibromyalgia, is not based primarily upon subjective perceptions by the patient. Thus, the arbitrariness of the "objective evidence" requirement is dependent on the type of condition allegedly suffered by a claimant. "Radiculopathy can be diagnosed through objective evidence such as MRIs, EMGs, and nerve conduction studies. As such, a denial of benefits based, in part, on the lack of objective evidence is not arbitrary and capricious." *Dolfi v. Disability Reinsurance Mgmt. Servs., Inc.,* 584 F. Supp. 2d 709, 732 (M.D. Pa. 2008) (citing *Wilson v. Metro. Life Ins. Co.,* No. 04-cv-05477, 2006 WL 3702635, *6, 9-10 (E.D. Pa. Dec. 13, 2006)) (other citations omitted). Moreover, the plan specifically requires objective criteria to support not a diagnosis of disability, but of a non-limited diagnosis such as a radiculopathy. The parties do not disagree that Plaintiff is disabled, but the terms of the plan require

objective evidence of a specific diagnosis in order for Plaintiff to qualify for benefits beyond the initial 24-month MBP. Because MetLife relied on a reasonable definition of objective evidence to require confirmation of a diagnosis that is supportable by objective findings, the court finds that it was within its discretion to require electrodiagnostic testing to confirm a radiculopathy.

### ii. *Radiculitis versus radiculopathy*

Plaintiff also argues that Dr. Goltz's diagnosis of "radiculitis" was arbitrarily dismissed as distinct from the Plan-defined term "radiculopathy." There is some support for the proposition that the terms are medically interchangeable. *See Hughes v. Astrue*, No. 10-cv-2574, 2012 WL 833039, *3 n.12 (M.D. Pa. Mar. 12, 2012) ("Radiculitis is synonymous with radiculopathy which is "characterized by pain which seems to radiate from the spine" to other parts of the body, including the extremities."). In the same breath, however, the court that recognized their synonymity points out a distinction: "Radiculitis is inflamation (sic) of the root of a spinal nerve . . . Radiculopathy is a result of disc herniation or an injury causing *foraminal impingement* of an exiting nerve." *Id.* As Dr. Gordan suggested, there was no evidence of an impingement, regardless of the existence of inflammation. Dr. Gordan appeared to conclude at least the possibility that radiculitis was nerve root impairment of a lesser degree than radiculopathy. As such, Dr. Gordan recommended objective (*i.e.* electrodiagnostic) testing to confirm or refute the

presence of radiculopathy rather than residual radiculopathic symptoms that could have arisen from nerve root irritation. *See Bluman v. Plan Adm'r & Trustees for CNA's Integrated Disability Program*, 491 F. App'x 312, 315-16 (3d Cir. 2012) (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003) (holding that "plan administrators are not obliged to accord special deference to the opinions of treating physicians"); *Stratton v. E.I. DuPont De Nemours & Co.*, 363 F.3d 250, 258 (3d Cir. 2004) ("A professional disagreement does not amount to an arbitrary refusal to credit."); *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 775 (7th Cir. 2010) (stating that "[a]n administrator may give weight to doctors who did only a records review"). Thus, MetLife was within its discretion to rely on Dr. Gordan's assessment that radiculitis was distinguishable from radiculopathy and that the sum of Plaintiff's subjective symptoms did not outweigh the lack of objective electrodiagnostic evidence. Furthermore, MetLife was within its discretion to credit Dr. Gordan's conclusion that Plaintiff's symptoms were more likely caused by axial pain and adjacent level disease than radiculopathy.

### iii. *Evidence supporting diagnosis of radiculopathy*

Plaintiff also argues that MetLife arbitrarily ignored evidence that would have supported Plaintiff's diagnosis of radiculopathy. Again, this argument requires separation of Plaintiff's disability diagnosis and a diagnosis of radiculopathy that would satisfy the plan requirements for additional benefits beyond the 24-month

MBP.[3]  There is significant overlap between Plaintiff's initial claim for LTD and Plaintiff's current claim for additional benefits, such as axial pain, limb weakness, positive Spurling's Sign, and inability to sit or stand for long periods of time.  Dr. Gordan acknowledges these symptoms could result in a differential diagnosis of radiculopathy but concludes that the negative electrodiagnostic testing at least lent weight to an alternative diagnosis.  The tests that could be considered objective, *i.e.* CT scan and x-ray, demonstrate degenerative changes and neuroforaminal stenosis, but not a radiculopathy.  (*See* Doc. 23, ¶¶ 21, 42.)  Weighing these symptoms and test results, Dr. Gordan found that a radiculopathy was possible, but not definitive, and that "adjacent level disease, which could cause his pain, [which] pain could inhibit his effort on strength testing, causing apparent weakness." Without any

---

[3] The court rejects Plaintiff's assertion that MetLife "reversed position" as to its claim determination.  MetLife originally denied Plaintiff's claim for LTD benefits finding that he did not meet the criteria for disability, but later reversed that determination after considering additional evidence.  There was no consideration or determination made as to whether he had radiculopathies or some other diagnosis that would allow him to exceed the 24-month MBP.

Similarly, Plaintiff's reliance on his receipt of social security disability benefits is not relevant.  A plan administrator is not bound by a ruling on social security benefits, primarily based on the different eligibility standards imposed for a finding of ERISA disability versus social security disability.  *Robinson v. Liberty Life assurance Co.*, 25 F. Supp. 3d 541, 555 (M.D. Pa. 2014).  However, the grant of social security benefits here confirms only what is not contested here: that Plaintiff is disabled.  It has no bearing on whether he has a radiculopathy.  *See Reed v. Citigroup Inc.*, 658 F. App'x 112, 115 (3d Cir. 2016) ("Nevertheless, we give this factor little weight, as the Plan required MetLife to assist [the plaintiff] in applying for [Social Security Disability Insurance ("SSDI")] benefits, and the Plan was structured so that an employee's benefit would be reduced by amounts received from SSDI. Thus, it would have been irregular for MetLife not to assist [the plaintiff] in applying for SSDI benefits.").

unequivocal medical support to the contrary, the court cannot find that MetLife's reliance either on Dr. Gordan's distinction between radiculitis and radiculopathy or his assessment of Plaintiff's symptoms and clinical findings is arbitrary or capricious.

Plaintiff additionally argues that MetLife arbitrarily ignored Dr. Goltz's conclusion because "Dr. Goltz pointed to several sources of objective evidence in support of [Plaintiff's] radiculopathies - and (sic) MetLife's physician consultant **did not discuss any of them**." (Doc. 24, p. 24 (emphasis in original).) This statement is patently incorrect. Dr. Gordan addressed and discussed all of Dr. Goltz's findings and concluded that, although they would offer support for a diagnosis of radiculopathy, they were not conclusive and were based primarily on subjective tests that relied on Plaintiff's description of pain sensations. (*See, e.g.*, Doc. 18-1, ¶ 45 (discussing differences between radiculitis and radiculopathy, lack of atrophy, lack of electrodiagnostic findings, distinguishing positive Spurling's Sign); ¶ 42 ("Radiculopathy is mentioned several times, but was not found on electrodiagnostic testing, although it does receive partial support in the physical examination findings of decreased sensation . . . and leg weakness, although the later appears to be generalized leg weakness, and thus not root specific. The evidence for radiculopathy

is, thus, not conclusive.")[4]  This assessment appears to be the precise type of professional disagreement that MetLife may exercise discretion in assessing. Accordingly, the court finds that MetLife did not arbitrarily favor Dr. Gordan's opinion over Dr. Goltz's opinion.

## IV.    Conclusion

For the reasons set forth above, the court finds that any structural conflicts of interest present in MetLife's plan administration structure were properly mitigated and that the procedural conflicts of interest alleged by Plaintiff do not render MetLife's denial of benefits arbitrary or capricious.  Accordingly, Defendants' motion for summary judgment will be granted.

An appropriate order will follow.

*s/Sylvia H. Rambo*
SYLVIA H. RAMBO
United States District Judge

Dated: August 15, 2019

---

[4] Plaintiff rightly notes that a court may consider whether a plan's failure to order an IME when it is allowed to do so may weigh against it in examining whether a decision to deny benefits was arbitrary and capricious.  *Reed*, 658 F. App'x at 115.  The factor, however, has little weight when the primary reason for a denial is based upon radiologic evidence rather than a physical assessment.